UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES

V.                                          Cr. No. 04-10231-MLW

WILLIAM A. HOWE

SENTENCING MEMORANDUM

Defendant William Howe, by his attorney, submits the following information in support of his request that he be sentenced to a period of home confinement and supervised release.

SENTENCING GUIDELINE ISSUES

The defendant has objected to the guideline calculation determined by the probation office as follows:

1.      Specific Offense Characteristics.

Mr. Howe submits that his offense level should not be increased for both "more than minimal planning" [§2F1.1(b)(2)] and "sophisticated means" [§2F1.1(b)(5)( C)].  Mr. Howe's admitted and acknowledged role in this conspiracy supports the conclusion that a 2 level increase should apply but not the additional increase for sophisticated means.  To do so runs afoul of the vice of double counting.  If the Court concludes that both increases apply in calculating the offense level, then this issue should be re-examined for departure purposes.

2.      Criminal History Computation.

Mr. Howe submits that his criminal history is Category I.  The probation office calculated defendant's January, 1989 conviction where a 6 month sentence was imposed on January 12, 1989.  §4A1.2(e)(2) applies to a prior sentence imposed within 10 years of the defendant's commencement of the instant offense.  Mr. Howe's participation in this offense commenced

1

sometime after January 12, 1999. [PSR paragraph 18] To the extent that the probation office has correctly established the starting date for Mr. Howe, then this issue should be re-examined as a basis for departure for criminal history category over representing the seriousness of criminal history.  The prior offense conduct ended in about 1982, prosecution resulted thereafter and sentencing was deferred for a period of many months while Mr. Howe endeavored to complete certain business transactions to aid in restitution.

    3.    Guideline Imprisonment Range

Mr. Howe submits that the correct guideline imprisonment range based upon total offense level 18 and criminal history category I, is 27-33 months.

    4.    Mr. Howe's age is mistakenly listed as 63 rather than 65 in PSR paragraph 18.

STATUTORY SENTENCING FACTORS, 18 U.S.C. §3553(a)

§3553(a)(1) - the nature and circumstances of the offense and the history and characteristics of the defendant.

By any fair assessment, this crime was created and manipulated by Peter Maggio.  Mr. Howe was clearly culpable, but not as the master manipulator and practiced con man.  Mr. Howe should have and did know better.  Mr. Howe was asked by Maggio's business lawyer to help Maggio get his business off the ground.  Mr. Howe prepared false financial documents, knowing they were false but believing they would be used to help Maggio obtain equipment which would make Maggio's business prosper.  Mr. Howe received a fee for preparing the documents, but did not share in any of the fraudulent loan proceeds.  Mr. Howe now faces federal imprisonment.

When confronted by FBI investigators, Mr. Howe, pre-indictment and without counsel, spent many hours reviewing records and aiding investigators.  Even while working with FBI

investigators, Mr. Howe did not understand the nature of and scope of Maggio's deceptions and nor the magnitude of this fraud conspiracy.

Mr. Howe provided undersigned counsel with certain written information to assist in preparation of this sentencing memorandum. Mr. Howe related that for more than 40 years he has devoted a significant portion of his life to volunteer work and helping others. He has been a Little League coach, a Big Brother, and a donor of whole blood and blood platelets. The following excerpts are included because they present a better and clearer picture of Mr. Howe than an edited version:

"Years ago I read a quote from the 19th century author, Ralph Lowell: The luxury of helping others surpasses every other personal enjoyment.

"All of [my] activities involve a personal, hands on, commitment; not simply a monetary contribution. I have taken a blind lady shopping; taken an orphan boy to the movies and ball games; listened to phone calls from potential suicide victims; transported a sick child in a wheel chair from hospital room to clinic or lab for tests; and occasionally I just sit, holding a crying baby, trying to rock the baby to sleep."

It is difficult to capture the essence of a person's heart and soul from reading a presentence report. In an effort to give this Court further insight into the 'history and characteristics of this defendant', counsel submits the following text written by Mr. Howe:

"I would like to [discuss] the exhibit detailing my 40 years of volunteer service, because that record is more depicting of who I am and what my life is all about. The details, descriptions, and time frames are pretty much self explanatory.

"Just so you know, at times during those volunteer activities, things have not always gone

3

according to plan.

"In 1967 when I first became a Big Brother, I thought I would be working in Detroit for 5-10 years, but I was transferred within 2 years. So when I told the boy and his mom (and the big brother program) that I was leaving, they felt that I had 'let the boy down' and they were not happy about my employment transfer. Even I thought I let the boy down because I initially said I could commit to a 3 to 4 year period and I did not.

"Another time when things did not go as planned was when I took the blind lady grocery shopping one day. The way to do this is to have her hold on to the shopping carriage handle as I pulled the carriage along, up and down the aisles, calling out what is in each one (cereal, bread, juice, canned goods, etc.). One day we go to the produce section and as I am walking her through it, and letting her know what was where, I came upon a hanging scale. I did not give any thought to it, I just ducked under it. When I was straightening myself up, and took a few more steps, I heard a loud clang, followed by a considerable amount of cursing. I had walked my client's forehead right into the scales - needless to say, she was not happy. Many other store customers looked at me in astonishment, and I was only too happy to get out of the store. Later we would laugh and joke about it, but not that day.

"Also one time at Children's Hospital, when I was volunteering at the information desk, a down-syndrom girl came up to me . I asked what she would like. She didn't want any of the toys, but did want the volunteer smock I was wearing. It looked like a large bib. I assumed the little girl and her mom were leaving the hospital, so even though the other volunteers said I could not give her a smock, I did. The girl's eyes lit up like I had given her a million dollars. After more small talk with the girl, and putting this mock on her, she and her mother left. I went back

to the volunteer office to get another smock.

"Unbeknownst to me, the girl never left the hospital. She paraded around the hospital in her new volunteer uniform telling anyone who would listen about her outfit. Needless to say, one of my supervisors was one of those listeners. Ultimately, the girl left the hospital, with the smock, and I was reprimanded for giving her the smock.

"I would like to tell three other stories which explain a little more about who I am.

"One night while returning from New York City, via I84 in Connecticut, I stopped in Southern Connecticut to get a bite to eat. It was about 9:30 pm and dark when I was getting back on the road and going up the ramp to get back on the interstate. Out of the corner of my eye I saw a vehicle broken down. I did not know why they were stopped, but 3 women were walking around the car. I was accelerating , so I could not stop. However, I sensed something was wrong. I proceeded to the next exit, turned around and returned to the vehicle. Sure enough they had a flat tire. This was probably in the early 1990's before everyone had a cell phone. They had been there over one hour and nobody had stopped. I was able to block the car to raise it on the jack. I had one of the women wave a flashlight to alert other drivers. Even though the tire was jacked up, the bolts removed, the tire would not come off the rim. I went to my car to get a hammer to try to bang the wheel off. I did not have a hammer but I had an ax. Here comes this strange man, but Good Samaritan, in the middle of the night, pitch black, towards 3 ladies, with an ax in his hand. So we joked about it and I got under the car, banged the wheel off, and put on the spare tire. Then I got the jack down, the blocks removed, and the ladies went on their way. They offered to pay me, but you cannot take money helping someone in distress.

"Another time, when driving down route 1 in Revere, I heard an explosion. Rocks

started flying down on all of the cars.  Blasting was occurring in the nearby quarry and they obviously used too much explosive .  I was in the high speed lane and was only hit with some small rocks.  I looked to my right to get to the breakdown lane and the car to my right had two ladies in it, with a rock the size of a basketball stuck between the hood and the windshield.  The windshield was severely damaged.  I rolled down my passenger side window and helped to coax them to the breakdown lane.  Once there, I could see that the two ladies were not hurt but pretty shaken up.  They were mother and daughter.  The daughter was bringing her mother to South Station from Gloucester.  They had a cell phone and called the police.  However, the mother had to catch her train within the hour.  I told them that I was going into Boston and could take her to South Station.  After some discussion, they agreed, and the mother and I were on our way.  Along the way, the mother realized that she took the car keys with her.  So after I dropped her off at South Station, I went back to the scene of the accident so I could give the daughter back the keys.  The daughter was astonished.  She could not believe that someone would go so far out of their way.  Sometimes if you stop briefly to help someone, it may take more hours than you think.

"One final story.  For 4-5 years in the late 1990's my wife and I would donate $50 at Christmas to Rosie's Place.  One year my wife and a friend received some 25% off discount coupons to be used on the Sunday morning after Thanksgiving.  I called Rosie's Place to see if there was something specific they needed.  The woman explained they needed ladies underwear.  So for the past 5-6 years I go to Filene's basement and buy underwear that has been on the shopping floor for over 30 days, and thus are 75% off.   I then get another 25% off with my coupons.  I can buy 20 $30 bras, usually $600,  for $37.  With my wife chipping in some of her

money, we now buy approximately $1200 of women's underwear for less than $100. Of course I get a few stares from other shoppers, but I do not worry about it. Sometimes I do tell people what I am doing and they then go make some small purchases for Rosie's Place."

Most significantly, for the past 15 years, Mr. Howe has donated his blood platelets. On September 27, 2006 he was recognized for making his 160th platelet donation. Unlike the 20-30 minutes required to donate a pint of whole blood, the platelet collection process takes almost 2.5 hours. The equivalent blood volume produced by platelet donation means that Mr. Howe's donations help 70-200 children per year.

FDA and Red Cross regulations restrict blood platelet donors to persons under age 70. Additionally, a donor cannot give blood or blood platelets for a minimum of one year following release from prison. Mr. Howe is almost 66 years old.

Lastly, Mr. Howe is concerned for his 98 year old aunt. This aunt resides in a nursing home and is not aware of this offense. Mr. Howe visits his aunt weekly, and is the only person who does visit this woman.

SUGGESTED SENTENCE:

Mr. Howe submits that the Court has sufficient reasons to impose a less severe sentence than the Guideline Sentence.

As sentencing jurisprudence evolves *post-Booker,* sentencing judges are increasingly encouraged and empowered to establish sentences that are reasonable and only as long as necessary to meet the overall goals of fairness and justice. See generally, *United States v. Jimenez-Beltre*, 404 F. 3d 514 (1st Cir. 2006); *United States v. Thurston*, 456 F. 3d 211 (1st Cir. 2006).

Mr. Howe submits that a reasonable, just and appropriate sentence is a term of home confinement and supervised release. In this manner, Mr. Howe will be punished, his liberty restricted; but also he will be able to continue to provide much needed blood platelets to be used by children in times of medical need, and be available to his aunt in her remaining time.

WILLIAM A. HOWE  
By his attorney,


/s/ Elliot M. Weinstein  
Elliot M. Weinstein  
BBO #520400  
83 Atlantic Avenue  
Boston, MA 02110  
617-367-9334

October 9, 2006

## CERTIFICATE OF SERVICE

I certify that this pleading was filed using the ECF system and service will be made upon parties by electronic mail.

/s/ Elliot M. Weinstein            October 9, 2006